IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                          CRIMINAL CASE NO.

v.                         1:09-cr-00438-JEC-LTW

ANGEL FLORES-URIOSTEGUI-01 and
EDGAR SAUCEDO-ESPINOZA-02,

        Defendants.

## ORDER AND OPINION

This case is before the Court on defendants' Motions to Suppress
Evidence and Statements derived from an allegedly illegal seizure and
subsequent search of defendants' persons and apartment [20, 23, 25,
29, 38, and 48] and defendant Saucedo-Espinoza's Supplemental Motion
to Suppress [33], which are all addressed in the Magistrate Judge's
Final Report and Recommendation ("R&R") issued by United States
Magistrate Judge Linda T. Walker [54]. In that R&R, the magistrate
judge recommended that the motions to suppress be granted.

Thereafter, the Government filed Objections to the R&R [56].
Defendant Flores-Uriostegui filed a Second Motion to Suppress [77];
defendant Saucedo-Espinoza filed a Motion to Adopt [78].

In addition to the above, counsel have participated in oral
argument before the Court and, since that time, the Government and

defendants have filed supplemental briefing at the direction of the Court. (Gov't's Supp. Br. [83] to Obj.; Def.'s Reply Br. [84].) After this court-directed briefing was completed, defendant Saucedo-Espinoza filed an additional supplemental brief [85] directing the Court's attention to a recent Georgia Court of Appeals case, whose holding, defendant argues, supports an argument that his conduct did not give rise to a reasonable suspicion that he or his co-defendant were loitering, in violation of Georgia law. The Government has not responded to this brief.

Finally, after the issuance of an opinion by the Eleventh Circuit--*United States v. Lewis*, 674 F.3d 1298 (11th Cir. 2012)--the Court directed the parties to respond to that decision, if they chose. Defendant Saucedo-Espinoza filed a supplemental brief [87] in response to the Court's invitation, which has been helpful to the Court. The Government did not file a reply.

For the reasons that follow, the Court **ADOPTS** the magistrate judge's factual findings and recommendation that defendants' motions to suppress be granted.

## BACKGROUND

I. **STATEMENT OF THE FACTS**[1]

This case arises from the seizure of over 11 pounds of methamphetamine, 8 guns, and 2 hand grenade hulls taken from defendants Angel Flores-Uriostegui [hereinafter "Flores"] and Edgar Saucedo-Espinoza's [hereinafter "Saucedo"] apartment after they had been questioned by Cobb County police officers in a nearby parking lot. A federal grand jury subsequently returned a seven-count indictment charging the defendants with three drug counts (involving methamphetamine and cocaine) and four firearms counts (possession of a firearm in furtherance of a drug trafficking crime and possession of a firearm by an alien). (Indictment [1].)

The facts, as found by the magistrate judge, and supplemented by additional references to the transcript, are as follows. Cobb County Police Officers Lewis Gray and Lee Turman were part of the Violent Incident Prevention and Early Response Team ("VIPER") created in October 2007 for the purpose of suppressing crime in high crime areas. The officers knew that the Belmont Crossings apartment complex was a high crime area that was particularly known for its

_____

[1] The Government does not object to the factual findings of the magistrate judge and the Court discerns no plain error in its own review. *See United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983)(district court reviews unobjected to portions of R&R for plain error). The Court **ADOPTS** the magistrate judge's findings of fact and supplements them to provide more detail. (*See* R&R [54] 3-7.)

high level of drug arrests and armed robberies. The officers had received information that apartments in that complex were being used to store large amounts of drugs, and they had initiated several search warrants in the area. Residents and visitors to the apartments did not limit themselves to drug crimes or armed robberies, as, just the day before the search at issue here, the police had engaged in a car chase with a stolen vehicle that began at the complex.

Therefore, on July 17, 2009, in uniform and traveling in a marked patrol car, the officers drove into the Belmont Crossings Apartments at approximately 6:00 p.m. While patrolling in the parking lot near building K of the apartment complex, the officers observed two males sitting inside a vehicle parked in front of building K. These males later turned out to be defendants Saucedo and Flores.

From about fifty to one hundred feet away, the officers observed the car for two to three minutes and noticed that its occupants were sitting motionless. These occupants neither moved the vehicle nor made any effort to leave it. The brake lights and reverse lights were not on; neither the engine nor air conditioning was running; and nobody came over to the vehicle. (Tr. of Evidentiary Hr'g [31] at 10, 28-29, 52-53.)

4

As noted, defendants were making no effort either to exit the car or drive the car away. The officers found it suspicious that defendants were sitting in a parked car in a high crime area, with no apparent purpose. Officer Turman testified that the defendants' immobility was as if they "froze" when they noticed the patrol car. (*Id.* at 71.) After observing this scenario for a few minutes, and without turning on their blue lights, the officers drove and parked their marked patrol car at a position partially blocking the rear of defendants' vehicle, which was facing the apartments. The officers concurred at the evidentiary hearing that it would have been difficult, if not impossible, for the defendants to move their car, given the placement of the patrol car. According to Officer Gray, the position of the patrol car behind defendants' car and the small area in the parking lot would have made it hard for defendants to move the car. According to Officer Turman, defendants would not have been able to move the car at all.

After parking the marked patrol car, Officer Gray approached defendant Saucedo, who was in the driver's seat, and asked him, through the driver's side window, what he was doing in the complex. Saucedo responded that he was there to visit a friend. Officer Gray then asked him for identification. Saucedo produced only a Mexican driver's license, which does not entitle a person to drive in the State of Georgia. The officer then asked again why Saucedo was in

5

the complex.  Saucedo then changed his story and said that, in fact, he lived in Apartment K-5 of the complex.  Throughout this exchange, Saucedo was nervous and sweating.  (*Id.* at 12-13.)

Around the same time, Officer Turman approached defendant Flores on the passenger side of the vehicle and asked if defendant Flores was a resident of the complex.  Defendant Flores responded  that he lived in Apartment K-5 and that both defendants had just come from that apartment.  Flores was "extremely nervous" and "visibly shaking."  The officer discerned he had an elevated heart rate, as his carotid artery was beating very quickly.  When Officer Turman asked for identification from Flores to confirm that he resided in Apartment K-5, the latter handed him a Mexican driver's license. (*Id.* at 53-55.)

In addition to his nervousness, Flores had been fidgeting with an apparently empty soda can and put that can over a set of keys that were in the center console, in what Officer Turman believed was an effort to hide the keys.  (*Id.* at 15, 56-58.)

Upon the receipt of Mexican identification from both defendants, Officer Turman went back to the patrol car to determine whether the occupants were licensed to drive a vehicle in the United States.  This computer check, which lasted two-three minutes, revealed that the defendants had no valid American driver's license. (*Id.* at 15-16, 56.)

6

After making this determination, the officer returned to the defendants' vehicle. Based on all the above circumstances, the officers asked the driver (Saucedo) and passenger (Flores) to exit the car, which they did. Saucedo was wearing baggy clothing and, out of a concern for his safety, Officer Gray patted him down to make sure that he did not have a weapon. He asked Saucedo whether he could search his pockets. Saucedo agreed, and the officer found two baggies containing what appeared to be cocaine. At this point, he placed Saucedo in handcuffs. (*Id.* at 17-18.)

Around the same time, Officer Turman was patting down Flores, and found a large quantity of cocaine (49 grams) in his pocket. Flores was likewise placed in handcuffs upon this discovery. (*Id.* at 20-21, 58-61.)

Officer Gray then called for a canine unit. After its arrival, the dog alerted to the presence of drugs at Apartment K-5. Likewise, the key that Flores had put under the soda can was tested on the door lock to Unit K-5, and it fit. The officers did not enter, but they did get a search warrant for the unit. (*Id.* at 21-23.) During a search of the apartment, the cache of weapons and methamphetamine referenced above was found.

## DISCUSSION

## I.   STANDARD OF REVIEW FOR REPORT AND RECOMMENDATIONS

Under 28 U.S.C. § 636(b)(1) and Rule 72 of the Federal Rules of Civil Procedure, the Court is obligated to conduct a *de novo* review of the portions of the R&R to which the objecting party--here, the Government--has objected.  The Court reviews the remainder of the R&R for plain error.  *United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983).  However, where a petitioner does not file specific objections to factual findings of the magistrate judge, this Court need not perform a *de novo* review of those findings.  *Garvey v. Vaughn*, 993 F.2d 776, 779 n.9 (11th Cir. 1993).  On matters of law, this Court retains the ultimate power to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C); *United States v. Elsoffer*, 644 F.2d 357, 359 (5th Cir. 1981)("The authority to grant or deny a motion to suppress must be retained by a judge appointed pursuant to Article III of the Constitution."); *United States v. George*, 971 F.2d 1113, 1118 n.6 (4th Cir. 1992)("A motion to suppress decided by a magistrate is not one of the pretrial matters that may be reviewed by the district court merely for clear error or plain error.").

8

## II. __ANALYSIS__

### A. __Whether Reasonable Suspicion Existed At The Time The Officers Confronted The Defendants__

The parties agree that, if the encounter between the officers and the defendants violated the latter's Fourth Amendment rights, then the evidence ultimately seized at the site of the encounter--the cocaine in the pockets, the key, and defendants' admission that they had a connection with Apartment #K-5--would have to be suppressed. Without that evidence, the officers would have lacked sufficient probable cause to obtain a search warrant of the unit, meaning that the cache of weapons and drugs found in that apartment would also have to be suppressed as a "fruit of the poisonous tree."

The law is well-settled that a police officer does not violate an individual's Fourth Amendment rights merely by approaching the person and asking questions. *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012). In such consensual encounters, the individual is always free "to disregard the police and go about his business." *California v. Hodari D.,* 499 U.S. 621, 628 (1991). As a consensual encounter does not implicate the Fourth Amendment at all, an officer does not need to have any basis for suspicion before approaching the individual to ask questions, as long as a reasonable person would feel free to terminate the encounter:

> Law enforcement officers do not violate the Fourth
> Amendment's prohibition of unreasonable seizures merely by
> approaching individuals on the street or in other public
> places and putting questions to them if they are willing to
> listen.... Even when law enforcement officers have no basis
> for suspecting a particular individual, they may pose
> questions, ask for identification, and request consent to
> search [property or person]-provided they do not induce
> cooperation by coercive means....If a reasonable person
> would feel free to terminate the encounter, then he or she
> has not been seized.

*United States v. Drayton*, 536 U.S. 194, 200-01 (2002)(citations omitted).

When a reasonable person would not feel free to walk away from the officer, however, a seizure has occurred. Yet, under the seminal case of *Terry v. Ohio,* 392 U.S. 1 (1968), such a brief investigatory stop does not violate the Fourth Amendment as long as (1) the officer has a reasonable suspicion that the suspect was, or is about to be, involved in criminal activity and (2) the stop was reasonably related to the circumstances that justified the interference to begin with. *Lewis*, 674 F.3d at 1303.

Relying on *United States v. Berry,* 670 F.2d 583, 597 (5th Cir. Unit B 1982), among other authority, the magistrate judge concluded that the officers seized the car in which the defendants were seated at the moment the officers blocked the vehicle with their own patrol car. (R&R [54] at 10-11.) That being the case, the magistrate judge focused the remainder of her R&R on the question whether reasonable suspicion existed at the time the officers so acted.

10

Comparing the facts of this case to those present in the many cases cited by the Government and defendants, the magistrate judge ultimately concluded that the officers here lacked reasonable suspicion to justify a seizure at the time they parked their patrol car behind defendants' car. (*Id.* at 12-22.) According to the magistrate judge, the fact that defendants were sitting motionless inside a car parked in a high crime area, fifty to a hundred feet away from the officers, could not support reasonable suspicion that defendants were about to commit, or were in the process of committing, a crime. (*Id.* at 13.) In reaching this conclusion, the magistrate judge rejected the argument that the officers could have objectively believed that defendants were violating Georgia loitering and prowling laws. (*Id.* at 14-17.) The magistrate judge also rejected the notion that defendants' behavior supported a reasonable suspicion that defendants were engaging in or about to engage in criminal drug activity. (*Id.* at 17-22.)

The Government has made an exhaustive effort to find and cite numerous cases in which investigative stops have been authorized in situations where the level of suspicion was as low as that present here. Defendants have been equally tenacious and prolific in their own citations. Without repeating the detailed dissection of the facts of the comparator cases that counsel and the magistrate judge have already performed, the Court concludes, like the magistrate

11

judge, that the quantum of suspicion possessed by the officers in this case was insufficient to give rise to reasonable suspicion at the time the officers blocked defendants' car with their patrol vehicle. Thus, if the defendants were seized at that point, the officers lacked reasonable suspicion to do so.

**B.  Significance Of Question Whether A Seizure Actually Occurred When The Officers Blocked Defendants' Car**

The magistrate judge's R&R and the briefing of the parties focused almost entirely on the question of reasonable suspicion. That is, the parties, and therefore the magistrate judge, assumed that the blocking of the defendants' car by the patrol car equaled a seizure that required reasonable suspicion.

But for a determination that this act by the officers constituted a seizure, the Court suspects that the encounter would otherwise have passed Constitutional muster. Stated another way, if one eliminates that single act, and if instead the officers had parked their car in a spot that would not have blocked the defendants' car, the subsequent seizure and search would likely have been permissible.

Under this revised scenario, the officers would have approached the car and engaged the defendants in consensual conversation. There would have been no problem with the officers requesting identification, as no seizure would have occurred. Once Officer Gray

saw that the putative driver of the vehicle had only a Mexican driver's license, the Court assumes that this fact would have given rise to a reasonable suspicion, if not probable cause under the circumstances, that he had been driving without a license. *See Marsengill v. State*, 275 Ga. App. 840, 841-42 (2005)(upholding conviction for driving without a valid license where circumstantial evidence showed that defendant with suspended license had been driving car before he parked it on side of road, even though officers did not actually see defendant driving car).

Clearly, the defendants would have been seized at the time that the officers retained the Mexican licenses for two-three minutes to check their status. *See United States v. Thompson*, 712 F.2d 1356, 1359-61 (11th Cir. 1983)(suspect seized when officer retained identification). Yet, by that point, there was adequate suspicion that the putative driver was not properly licensed to drive, which, combined with the extreme nervousness of both defendants and with defendant Saucedo's shifting story about his residence, would have provided reasonable suspicion for the officer to conduct a very brief check to determine whether the defendants actually possessed valid driver's licenses. *See United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991)(upholding detention of defendant who was driving a rental car with a restricted license, who was shaking and acting

13

extremely nervous, and who gave conflicting responses as to where he had been).

At that point, the officers would have learned that neither defendant was licensed to drive in the United States. By this time, the now escalating quantum of suspicion would have likely justified the officers asking the defendants to get out of the car. A frisk would have been appropriate, given the officers' safety concerns. *See United States v. Hunter*, 291 F.3d 1302, 1307 (11th Cir. 2002)("An officer who has a reasonable suspicion that an individual is engaged in illegal activity and is armed with a concealed weapon is justified in conducting a limited search for weapons."); *United States v. Fields*, 178 Fed. App'x 890, 892 (11th Cir. 2006)("defendant's presence in a high crime area and his nervous or evasive behavior are relevant factors in determining reasonable suspicion"); *Maryland v. Wilson*, 519 U.S. 408 (1997)(officer may order a passenger out of a vehicle during a stop for a traffic infraction); *Lewis*, 674 F.3d at 1309 (permitting brief detention of defendant not suspected of firearms violation, when officers had reasonable suspicion that defendant's associate was carrying a concealed weapon).

Finally, the defendants' consent to a search of their pockets would have resulted in the discovery of drugs on both their persons, thereby justifying an arrest. Then, the remaining events--the use of

14

the drug dog and the obtaining of a warrant for the defendants' admitted apartment--would likewise have been acceptable.

So, albeit the Government did not pursue this argument, one might reasonably ponder whether there was any room to argue that the officers' act of blocking the defendants' car did <u>not</u> constitute a seizure. The Court concludes that such an argument could have been credibly made.

In the R&R, the magistrate judge references non-binding authority from other circuits for the proposition that the physical obstruction of a person's vehicle by a marked patrol car occupied by two uniformed police officers would lead a reasonable person to believe he was not free to leave. Accordingly, the individual would be deemed to be seized at that point. (R&R [54] at 11.) However, in conducting its own research, the Court has discovered binding authority from the Eleventh Circuit holding that the blocking in of a subject's vehicle by a patrol car does not, by itself, necessitate the finding of a seizure.

As noted, a police encounter that does not involve coercion or detention does not implicate Fourth Amendment scrutiny. For example, officers are free, without any level of suspicion, to approach citizens on the street and ask them questions, request proof of identification, and ask for consent to search. *Lewis*, 674 F.3d at 1303 (citing *United States v. Drayton*, 536 U.S. 194, 200-06 (2002)).

15

However, a person is "seized" under the Fourth Amendment when "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *United States v. Dunn*, 345 F.3d 1285, 1288 (11th Cir. 2003)(citing *Kaupp v. Texas*, 538 U.S. 626 (2003)).

On the other hand, if a reasonable person would feel free to terminate the encounter, then there is no seizure. *U.S. v. Perez*, 443 F.3d 772, 777-78 (11th Cir. 2006). Several factors must be considered in determining whether a "reasonable person would feel free to terminate the encounter," including "whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education, and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police." *Id.; United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991).

As to the pivotal question here, in this Circuit, a patrol car's obstruction of a defendant's vehicle is not a *per se* seizure that must be supported by reasonable suspicion. *See Miller v. Harget*, 458 F.3d 1251 (11th Cir. 2006). In *Miller*, a § 1983 case, an officer observed a vehicle weave in between lanes without signaling and then make an improper turn into a hotel parking lot. *Id.* at 1253. The

16

officer pulled into the lot and parked directly behind the suspect's already parked vehicle. *Id.* The officer "initialed" his "window lights" and beeped his siren to let the occupants know he was there. *Id.* The officer did not flash his roof lights. *Id.* He got out of his patrol car and approached the window of the driver's side. *Id.* The suspect lowered the window and the officer immediately detected the odor of alcohol and other evidence of the suspect driver's intoxication. *Id.* The officer eventually arrested the suspect for driving under the influence. *Id.* at 1254.

The district court found that no seizure occurred until the officer approached the vehicle, smelled alcohol, and observed the plaintiff's appearance. *Id.* at 1256. In other words, the blocking of the suspect's car did not constitute a seizure. The Eleventh Circuit affirmed, holding that, under the totality of the circumstances, "there was 'no show of authority that communicate[d] to the individual that his liberty [was] restrained, meaning he [was] not free to leave.'" *Id.* at 1258. As such, the officer did not require reasonable articulable suspicion to block the suspect's vehicle with his patrol car.

The Eleventh Circuit began its analysis by citing the proposition that a police officer does not seize a person merely by approaching him in a parked car. *Miller*, 458 F.3d at 1257. From there, the panel relied on a number of facts to support the

17

conclusion that the suspect was not coercively detained. First, the delay between parking the officer's patrol car and approaching the suspect's window was "extremely brief." *Id.* Second, before the suspect voluntarily lowered the window, the officer did not draw his gun, give any directions to the suspect, or activate his roof lights. *Id.* Third, the suspect expressed an intention to leave the vehicle and walk to his room after voluntarily parking the car, not exit the parking lot in his car. *Id.* As such, it was not "dispositive that [the officer] would have prevented [the suspect] from backing...the car out of [the] parking space." *Id.* The opinion also expressly rejected the notion that the officer's use of his "window lights" while parking directly behind the vehicle amounted to a coerced detention. *Id.* at 1258. The officer was merely letting the suspect know he was behind him. *Id.*

Based on these facts, the Eleventh Circuit held that "[c]onsidering the fact that the first contact between [the suspect] and [the officer] did not occur until [the suspect] lowered the window, the fact that [the officer] pulled up behind [the suspect] and turned on his 'window lights' does not demonstrate that [the suspect] was coercively detained." *Id.* at 1258.

The facts here are similar to the relevant circumstances in *Miller*. In both instances, the officers pulled their marked patrol car behind a suspect's vehicle in such a way that the suspect could

18

not leave. Unlike the officer in the *Miller* case, however, Officers Gray and Turman did not turn on their "window lights" or otherwise alert defendants to their presence. Thus, their approach was less intrusive than was the *Miller* officer's approach. There is also nothing in the record to suggest that the delay here between the parking of the patrol car and the approach of defendants' vehicle was anything other than "extremely brief." Perhaps most important to the *Miller* court's analysis was the absence of any display of authority prior to approaching the vehicle. Like the law enforcement official in *Miller*, Officers Gray and Turman did not draw their guns, give any directions to defendants, or activate their patrol car lights before approaching the vehicle.[2]

Most significant, perhaps, is the fact that the officers did not stop the vehicle, either in *Miller* or here. Indeed, neither the suspect in *Miller* nor defendants here showed any indication of a desire to move their vehicle. Here, the defendants' vehicle's engine was not running, the air conditioning was off, the windows were up, and no brake lights or reverse lights were on. Indeed, neither defendant testified that he was even aware, at the time that the

---

[2] The fact that the officers were in uniform and had holstered firearms is given "little weight." *Perez*, 443 F.3d at 778 n.2 ("We accord 'little weight' to the unremarkable fact that Lt. Gonzalez was in uniform and had a holstered firearm.").

19

officers first made contact, that the officers' patrol vehicle was blocking their car.

Therefore, in viewing the totality of the circumstances, defendants were arguably not coercively detained when the officers pulled their patrol car behind defendants' vehicle. *See United States v. Espinal*, Criminal Case No. 1:11-cr-0060-4-ODE-RGV, 2012 WL 92451 (N.D. Ga. Jan. 10, 2012)(Evans, J.)(finding no seizure where officer pulled directly behind parked car before asking occupant questions); *United States v. Graham*, 323 Fed. App'x 793, 798-99 (11th Cir. 2009)(no seizure where officers did not display any sign of authority). *Compare Childs v. DeKalb Cnty.*, 286 Fed. App'x 687, 695 (11th Cir. 2008)(suspects seized when officer used blue emergency lights as he pulled up behind suspect's vehicle; officers stopped vehicle in the middle of restaurant parking lot, blocking defendant from either pulling into a parking space or leaving the lot; officers ordered vehicle's occupants to produce ID and threatened to arrest them if they did not comply; officer ordered suspects to exit vehicle and demanded they hand over paper containing officer's license plate number; and officer grabbed suspect's wrist when he tried to comply with officers' request for ID).

As such, the officers here arguably did not need reasonable suspicion before parking their vehicle behind defendants. If that is so, then, as outlined above, the officers would have possessed

20

reasonable suspicion at the indisputable point when they did seize

the defendants: that is, the point at which they kept the defendants'

Mexican driver's licenses to run a computer check.

### C. Inequity In Allowing Government To Prevail On A Theory That It Has Not Previously Pursued

As set out above, although it is not a certainty, it may well be

that the Government might have prevailed had it argued that the

officers' act of parking their car behind the defendants did not

constitute a seizure. Nevertheless, the Government was given several

rounds of briefing but never adequately made this argument, and

certainly never cited the *Miller* case, which the Court has found.

Specifically, in the Government's post-hearing response to the

suppression motion, before the magistrate judge, the Government

provided two headings for its argument that the evidence should not

be suppressed: (1) that reasonable suspicion existed for the stop

(Gov't's Resp. [49] at 7) and (2) that the patdown of passenger

Flores was permissible under the "plain feel" test. (*Id.* at 11.)

The magistrate judge noted in her R&R that the Government had

made a couple of stray statements in the response brief that might

have suggested the Government's belief that a detention occurred at

a later point than the point at which the officers blocked the

defendants' car. (*See* R&R [54] at 10.) The Court does not view

these statements as constituting an argument that no seizure had

occurred when the patrol car blocked the defendants' car. Indeed, the Government cited no cases in support of those stray remarks, which, at most, suggested only the possibility of such an argument.

In its objections to the magistrate judge's R&R, the Government again did not argue that no seizure occurred when the officers parked their car behind the defendants' vehicle. The Government notes that the magistrate judge correctly related the essential factual basis for the stop, but incorrectly concluded that reasonable suspicion was absent. (Gov't's Objs. [56] at 1.) Indeed, the Government stated that it:

> concedes *arguendo* that the defendants were not free to leave the moment the officers pulled behind them. A suspect engaged by police in a *Terry* stop is *de facto* detained....That fact does not heighten the minimal burden the Government must satisfy to support a *Terry* stop.

(*Id.* at 8-9 n.1.)

Likewise, in its supplemental briefing before this Court, the Government does not argue that the act of parking behind the defendants fell short of conduct constituting a seizure.[3]

In short, the Government did a good job trying to persuade the magistrate judge and the undersigned that reasonable suspicion

---

[3] The Government does note that, as a factual matter, it is not clear whether defendants' car was so blocked that the defendants could not have been able, albeit with some difficulty, to maneuver past the police car. (Gov't's Supp. Br. [85] at 4 n.1.) Implicit in that statement is a concession that if the car could not be so maneuvered, a seizure had occurred.

existed at the relevant time. It made no effort, however, to argue that a seizure had not occurred at the point when the officers approached defendants' car.

The Court could direct further briefing on this latter question and, in particular, on the impact of the *Miller* decision on this case. That additional briefing might prompt the Court to deny defendants' suppression motion. Yet, the Government's failure to raise this issue is an implicit acknowledgment that it believed that a detention occurred when the officers blocked defendants' car. More importantly, it would not be fair to the defendants to allow this case to be reopened on a ground not previously asserted by the Government. There have been many briefing opportunities in this case. At each juncture, counsel for defendant Saucedo has provided very thorough and helpful briefing, including two supplemental briefs that were recently filed. To start the case all over again on this new ground would not be equitable.

Accordingly, the Court concurs with the magistrate judge's decision regarding the absence of reasonable suspicion at the relevant point of the stop. For the reasons noted, it concludes that the Government has conceded that a seizure had actually occurred at

23

this point.  The Court therefore does not decide whether it would have found a seizure, had the issue been properly raised.[4]

**CONCLUSION**

For the foregoing reasons, the Court **ADOPTS** the magistrate judge's R&R [54] recommending that defendants' suppression motions be granted.  The Court **DENIES as moot** defendants' later suppression motions [77, 78].


SO ORDERED, this 22nd day of MAY, 2012.


/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

---

[4] Of course, the fact that the Court might have ruled that no seizure occurred on the specific facts of this case does not mean that it is wise for an officer to block a suspect's car in the hope that a court will later decide that such conduct required no reasonable suspicion.

AO 72A
(Rev.8/82)